## Case No. 8,192.

### LEE v. KAUFMAN et al.

[3 Hughes, 139.] [1]

Circuit Court, E. D. Virginia. Jan. 30, 1879.[2]

TAX SALES — TENDER OF TAX BEFORE SALE BY FRIEND—CUSTOM OF COMMISSIONER TO RECEIVE ONLY FROM OWNER—WAIVER OF TENDER.

Under the act of June 7, 1862 [12 Stat. 422], amended by that of February 6, 1863 [Id. 640], "for the collection of the direct tax in insurrectionary districts." etc.. as construed in Bennett v. Hunter, 9 Wall. [76 U. S.] 326, and Tacey v. Irwin, 18 Wall. [85 U. S.] 549, a tender by friend or agent of the owner of the tax due upon property advertised for sale is a sufficient tender; and, moreover, if the tax commissioners have, by an established general rule, announced, and a uniform practice under it, refused to receive the taxes due unless tendered by the owner in person, even a formal offer by another to pay is unnec-

¹ [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]
² [Affirmed in 106 U. S. 196, 1 Sup. Ct. 240.]

essary. It is enough if a friend or agent of the owner went to the office of the commissioner to see after the payment of the tax on the property, but made no formal offer to pay because it was in effect waived by the commissioners, they declining to receive any tender unless made by the owner in person.

[Cited in King v. La Grange, 61 Cal. 229.]

In ejectment. The case came on for trial on the merits of this term of the court, the same counsel on either side in attendance as on the trial of the question of jurisdiction [Case No. 8,191], and was put to the jury. The only questions of law that could arise in the case were of course upon the prayers of counsel for instructions to the jury. These prayers were numerous, but none of them touched the merits of the controversy very essentially except those which were commented and passed upon by the court in the following opinion of the court delivered in the course of the trial.

HUGHES, District Judge. The two instructions [3] asked for by the plaintiff, and the instructions No. 1 asked for by the defendants, depend upon the same principles of law, and may be considered together. I think these instructions embrace the principles of law which control the case under trial, and it would seem to be hardly necessary to give much special consideration to the other instructions offered. I will premise that the certificate of the sale of Arlington made by the tax commissioners, which can be impeached only by showing either, 1st, that the property was not subject to the tax for which it was sold; or 2d, that it was after the sale redeemed from the tax according to the provisions of the law of 1862; or 3d, that the tax had been paid before the tax sale; is impeached by the plaintiff in this suit only on the last of these grounds. The sale is conceded to have been valid in other respects. This objection to the sale is made by the plaintiff not on the claim that the tax was in fact paid, but on the claim that he (or his predecessor in title) did all that he was bound to do by law towards paying it; that the non-receipt of it by the government was not through fault of his, but through fault of its own officers; and that, having himself done what was the equivalent of paying the tax, the land was not forfeited by law, and the commissioners' sale of the property for the tax was therefore unauthorized, null, and void.

The instructions under consideration all relate to the question whether the acts of the plaintiff (or of his predecessor) in regard to the payment of the tax were in law the equivalent of payment to the extent of preventing a forfeiture. The plaintiff's claim is, that through a friend or agent he went to the tax commissioners, at their office, during the period when the tax was receivable by law, with money in hand for the purpose, and proposed to pay the tax, but was pre-

³ They are given at the end of this opinion.

vented from doing so or from tendering payment by being informed by such one or more of the commissioners as were then in their office, that the tax would not be received except from the owner of the land in person. He claims, moreover, that this rule of the commissioners, this construction which they put upon the law of 1862 and 1863, was so generally known and announced as to amount to a waiver of tender on their part, and that he was thereby exonerated from the useless task and nugatory formality of making tender or offer of payment through an agent or friend (through whom he had a right to act in the matter), and was thereby relieved in law from default, and his land from forfeiture for the tax.

The single question raised by the three instructions under consideration is therefore whether the tax imposed upon this estate by the law of June 7th, 1862, "for the collection of direct taxes in insurrectionary districts," as amended by the act of February 6th, 1863, could be paid except by the owner in person. The clauses of the act of 1862, as amended, under which the sale of Arlington was made, are substantially in the following words. Section 3 provides: "That it shall be lawful for the owners of land, within sixty days after the tax commissioners shall have fixed the amount, to pay the tax thus charged into the treasury of the United States or to the tax commissioners, and take a certificate thereof, by virtue whereof the land shall be discharged from the tax." Section 4 declares the land forfeited on the non-payment of the tax as required by section 3. Section 7, after providing that if the tax is not paid as required in section 3 it shall be sold, goes on in one of its clauses to provide substantially: That in all cases where the owner of land shall not, on or before the day of sale, appear in person before the tax commissioners and pay the amount of the tax, with interest and cost of advertising, and request the land be struck off for a less sum than two-thirds of its assessed value, the tax commissioners shall be authorized at the tax sale to bid off the land for the United States at a sum not exceeding two-thirds of its assessed value, unless some person shall bid a larger sum, in which case the land shall be struck off to the highest bidder. In another clause of the same section 7 it is provided, substantially, that at the tax sale, any tract of land which may be selected under the direction of the president for government use, for war, military, naval, revenue, charitable, educational, or police purposes, may be bid in by the tax commissioners for, and struck off to, the United States. Another clause of section 7 allowed the owner of lands so sold to redeem the same, in the following terms: "The owner of said lots of ground, or any loyal person of the United States having any valid lien upon the interest in the same, may, at any time within sixty days after said sale, appear before the said board of tax commissioners in his or her own proper person, and, if a citizen, upon taking an oath to support the constitution of the United States, and paying the amount of said tax and penalty, with interest thereon from the date of the said proclamation of the president mentioned in the 2d section of this act, at the rate of fifteen per centum per annum, together with the expenses of the sale and subsequent proceedings, to be determined by said commissioners, may redeem said lots of land from said sale," etc. These having been the provisions of the law in force at the time of the tax sales under consideration, it is obvious that all sales at which private persons became purchasers must have been made under the first quoted clause of section 7; and, the price bid for Arlington ($26,200) having been more than two-thirds of its assessed value ($22,733), and it having been struck off to the United States at such price, it is equally obvious that the sale of Arlington was made under the second quoted clause of section 7, and could not have been made under the clause first quoted.

Upon this state of the law, the supreme court of the United States, in the case of Bennett v. Hunter, 9 Wall. [76 U. S.] 326, in which Bennett had purchased land under the first clause of section 7 above quoted, decided that a tender of the tax by an agent of the owner to the tax commissioners, before the tax sale, was equivalent to a payment, so as to destroy their authority to sell and to render their sale invalid; and it so held, notwithstanding the language of the first above-quoted clause of section 7, providing that sale might be made in all cases in which the owner had not, before the sale, appeared in person before the tax commissioners, and paid the tax. The court expressly remarked in its decision, that it "did not perceive in the terms of the act any limitation of the right of paying the tax to the owner in his proper person." In ascertaining who was authorized to pay the tax, which it expressly said was the only question in the case, the court seemed to feel bound to confine its view to section 3 as the part of the act which determined the rights of the owner of land in regard to paying the tax—a section which did not expressly require the owner to pay in person. The court in determining this question, refused to consider the terms used in section 7, the object of which section was, not to determine the rights and duties of the owner of taxed land, but the powers and duties of the tax commissioners after the owner had failed to pay the tax. It was not necessary for the court in this case to look beyond and above the terms of the statute in determining the rights of the owner of taxed land, but I think it was evidently in its mind that there was no power in congress to impose conditions much less disabilities upon the owner of land subject to taxation, as to the manner of paying the tax at any time before the divestiture of his title by a tax sale made

after delinquency and forfeiture. It distinguished the indefeasible right of the owner to pay the tax by an agent before sale, from the right of redeeming the land after forfeiture and sale; intimating that congress might properly limit the right of redemption to the owner in person, while it could not constitutionally prohibit payment of the tax by an agent before the sale. I say that it was not necessary for the court to resort to this higher ground in deciding Bennett v. Hunter [supra], but from the tenor and spirit of its language I am persuaded that the proposition was in its mind that congress had no power to restrict the owner of land, in paying the tax, to payment in his own proper person.

In the case of Tacey v. Irwin, 18 Wall. [85 U. S.] 549, the tax sale of the land had been made to a private purchaser under the first quoted clause of section 7. In that case no tender of the tax had been made by Irwin's agent. The language of the record on this point in the court's finding of the facts is: "Whilst the said premises, however, were advertised for sale, his (Irwin's) brother-in-law went to the office of the commissioners to see after the payment of the tax on the property, but made no formal offer or tender of payment, because such offer or tender was, in effect, waived by said commissioners, they declining to recognize any tender unless made by the owner in proper person." This case differed from that of Bennett v. Hunter, in the fact that there was no tender of the tax to the tax commissioners by the friend or agent of the owner. The owner's brother-in-law merely went to see after the payment of the tax, but made no formal offer or tender of it, that being virtually waived by the commissioners in declining to recognize any tender unless made by the owner in proper person. Judging from the language of the court, the decision in that case, as I read it, was based not merely on the presumption that an offer would not have been made, but for the refusal to recognize a tender by an agent in that particular instance, but was based also on the fact that it was the rule and practice of the commissioners so to refuse. I think a careful and unbiased reading of the decision in Tacey v. Irwin leads to the inevitable conviction that it was based chiefly on the existence of that rule and practice, and but partially, if at all, on such declarations of the commissioners on the occasion when Irwin's brother-in-law called "to see about paying the tax," as deterred him from making a formal tender. But I think the higher principle on which both of the decisions under review were made was, that the language quoted in section 7, implying a requirement that the owner should pay the tax in person, was overridden by the superior principle of constitutional law, that congress had no right in levying a tax for purposes of revenue, to impose disabilities or denounce penalties for political conduct, thereby converting revenue laws into instruments for indirectly confiscating that entire estate in land which the constitution forbids congress from confiscating by direct laws. But whatever view might have been in the mind of the court, Bennett v. Hunter and Tacey v. Irwin [supra] were cases involving lands which were sold under that provision of section 7 which expressly gave authority to sell in all cases where the owners had not appeared in person before the commissioners and paid the tax. The court decided that sales thus expressly authorized were nevertheless void when the owners had through friends or agents tendered payment of the tax, and that the law would presume that owners were ready to make offer of payment by friends or agents if such offer had not been rendered nugatory in advance by a rule and practice of the commissioners to receive the tax only from owners in person. If, therefore, sales expressly authorized by the language of section 7 were void, then for a stronger reason was the sale of Arlington void, which could not, as I conceive, have been made under this clause of section 7, apparently containing such express authority, but was made under another clause of that section, which authorized sales to the United States of such lands as the president should direct to be purchased for military, educational, or kindred purposes, without reference to whether or not the owner had offered to pay the tax by a friend or agent. If the principle on which the supreme court decided the sales of Hunter's and Irwin's lands to be void was so strong as to override express language authorizing them, found in the law, it certainly may be followed in the present case, where the land was sold under a provision which in terms gave no authority to sell lands of persons who had not appeared in person to pay the tax.

I cannot agree with defendants' counsel in the opinion that the two clauses in section 7, one of them authorizing sales to both government and private persons, but restricting the government to bids not exceeding two-thirds the assessed value of the lands, and the other clause, directing the sale of lands to the United States without restriction of price when the president ordered their purchase for certain purposes, as both governing in such sales as that of Arlington. I think the clauses are distinct and several, each of them authorizing sales which could not have been made under the other. The sale of Arlington could not have been made under the prior clause of section 7, because it was not made to a private person, nor made to the United States at a price less than two-thirds of its assessed value. How, therefore, could both clauses have governed in this sale? The language of the prior clause imposing disabilities as to the payment of the tax by restricting the right to owners in person, is for that reason to be construed strictly, is to be given as limited an application as possible, and is not unnecessarily to be extended to

other clauses of section 7. But even if this rule of construction did not govern, I do not think that the language of the clause authorizing the sale of the lands of all owners who had not appeared in person and paid their taxes, could, by any logical construction, be extended to the other clauses of section 7. This clause is an independent provision, not found in the original law, not necessary to the sense of any other part of the law either in its original or present form, not connected grammatically or in logical course of thought with the context, but interjected into a place in the section no better suited to its admission than any other place, and having every characteristic of a piece of patchwork. I do not think it has any control over the other clause standing at a distance from it in section 7, under which Arlington was sold; and I do not think that the theory of defendants' counsel that the two clauses apply inseparably to all sales is tenable.

I do not think I ought to pass unnoticed the distinction which defendants' counsel drew in their argument for their instruction No. 1, between a tax sale made to a private purchaser, such as was passed upon by the supreme court in the two cases which have been under consideration, and a sale made to the United States, no instance of which has been considered by the supreme court in connection with the question whether or not an owner could pay his tax by an agent and not in person. They base this distinction upon the pretension that although under the decisions of the supreme court in the two cases referred to, a tender or offer of the tax made before the tax sale by a friend or agent of the owner is valid against the purchaser, if the land be afterwards purchased by a private person; yet, if the purchaser turn out to be the United States, that fact, under the language of the first-quoted clause of section 7, will retroactively render the tender or offer of the tax by a friend or agent, which was valid and sufficient before the sale, void afterwards as against the United States. I have already expressed the opinion that the language in the clause of section 7 referred to, does not apply to a sale to the government made under direction of the president, as this sale of Arlington was. But even if the case were otherwise, I do not see how such a distinction as counsel have taken can be maintained. The decisions in Bennett v. Hunter and Tacey v. Irwin were intended to define the rights of owners of lands assessed with taxes, during the period anterior to the tax sales. The first decision distinguished between the rights of a landowner before the tax sale and his rights after the sale. It held that, as the object of the law under review was to raise taxes and not to inflict penalties for political conduct, it must be construed with reference to and in aid of that object. It held that an owner of taxed land had a right to pay the taxes due, through a friend or agent before sale: and the chief justice, I repeat, discriminated between this right of paying taxes by an agent, and the absence of the right to redeem lands after their sale for taxes, except in person. Those decisions establish the right of any owner of land, taxable under the laws of congress imposing direct taxes, to pay the tax by a friend or agent, at any time before the tax sale. If the owner had this right to tender or offer payment of a tax through a friend or agent at any time before a sale, and the right was denied him, then it is difficult to see how a subsequent sale to a particular purchaser could, by ex post facto and penal operation, annul that right. A law which makes such discrimination would seem to be unconstitutional, not only in giving to an act performed by government officials under it an ex post facto and penal effect, but also in depriving a person of his vested right in property by a process other than "due process of law," as that phrase is used by the constitution. The impolicy of such a provision of law is as obvious to me as its unconstitutionality. Its evil would be liable to fall not only upon disloyal but upon the most loyal citizens. A severe illness lasting only ninety or a hundred days, would subject the owner of land to the irreclaimable loss of its possession and of all but two-thirds of its value; for the period of advertisement added to the sixty days allowed by the act for redemption, would require an illness of less than a hundred days to divest a citizen of his estate. We can imagine, too, a case of even grosser injustice, which might happen by accident, though my respect for the government forbids me to think it could be morally possible by design. It might happen by accident that government, desiring a piece of land belonging to a loyal citizen engaged in its military service, might in time of war order his command to a distant and protracted service, rendering it impossible for him "to appear in person before the tax commissioners and pay the amount of his tax," and thereby bring on a sale of it for taxes, at which sale it would itself have the power to obtain the land irreclaimably. The familiar expedient employed by King David towards Uriah would here be repeated by accident. I doubt the constitutionality of any provision of a law for raising revenues which would subject to forfeiture lands upon which the taxes, when tendered in behalf of the owner, would by its own terms be prohibited from being received. A law passed for raising taxes, if containing provisions inflicting, without trial, disabilities and penalties for political conduct, in defeat of revenues, would be construed by any court liberally in aid of the provisions for raising revenues, and very narrowly as to the provisions inflicting penalties in defeat of revenues. I think I may construe the decisions of the supreme court, in the two cases which have been cited, as going to the extent of holding that the owner of land assessed for taxes under the laws of 1862-63 might pay them, or tender or offer to pay them, through an agent, at any time

before the tax sale, as against all purchasers, whether private individuals or the United States. I therefore feel bound to refuse the instruction No. 1, prayed for by defendants' counsel. On the other hand, on the authority of the decisions of the supreme court in Bennett v. Hunter, and Tacey v. Irwin, rendered upon the proceedings of the same tax commissioners as sold Arlington, and the validity of whose certificate of sale is now impeached on the same grounds as were relied upon in those cases, I feel not only authorized, but bound, to give the two instructions asked for by the plaintiff. They are in these words:

"Instructions for the plaintiff: (1) If the jury believe from the evidence that Philip R. Fendall, for and on behalf of the owner of the property in controversy, prior to the sale thereof of the tax commissioners, on the 11th day of January, 1864, offered to pay the amount chargeable on said property, under the act of congress entitled 'An act for the collection of direct taxes in insurrectionary districts within the United States, and for other purposes,' approved June 7th, 1862, and the acts amendatory thereof; and that said offer was refused by said commissioners because it was not made by the owner in person, then said sale was unauthorized, and conferred no title upon the purchaser. (2) If the jury believe, from the evidence, that the commissioners, prior to January 11th, 1864, established, announced, and uniformly followed a general rule, under which they refused to receive, on property which had been advertised for sale, from any one but the owner or a party in interest, in person, when offered, the amount chargeable upon said property, by reason of said acts of congress, then said rule dispensed with the necessity of a tender, and in absence of proof to the contrary the law presumes that said amount would have been paid, and the court instructs the jury that, upon such a state of facts, the sale of the property in controversy, made on the said 11th day of January, 1864, was unauthorized, and conferred no title upon the purchaser."

The verdict of the jury was for the plaintiff. The defence on the coming in of the verdict moved to set it aside as contrary to the law and the evidence of the case, and the motion was entered and set for hearing at an adjourned term of the court in the April following. At the time set for the hearing of the motion defendants' counsel relied upon a decision which had been shortly before made in the case of Carr v. U. S., since reported [98 U. S. 433]. But the judge did not think the case so conclusive as to justify a new trial, and a renewal of his ruling on the question of jurisdiction. He has filed the following note on that case:

Note of the Judge on the case of Carr v. The United States.

HUGHES, District Judge. In the case of Carr v. U. S. [supra], the court below

and the supreme court, on a bill brought by the United States to test the validity of the title in real property, both held that the United States were entitled on the law and evidence, of right, to the property. There had been previous suits before state justices of the peace, and in county and other local state courts, in which the title of the grantor of Carr had been held good by these courts; but in none of these suits were the United States a party of record, and only in some of these state courts were its officers or agents parties. The decision of the supreme court in this case of Carr v. U. S. is that judgments of inferior state courts to which the United States were not a party did not estop the United States from setting up their right in a suit in which they are properly a party. This is true on the general principles of estoppel. There is a dictum in the case that where it appears in the course of a suit for possession that the possession assailed is that of the government the suit ought to cease; but this is a dictum, and I am not at liberty that the court would intend by a dictum to overrule its own judgments in the cases of Meigs v. McClung [9 Cranch (13 U. S.) 11]; Wilcox v. Jackson [13 Pet. (38 U. S.) 498]; Grisar v. McDowell [6 Wall. (73 U. S.) 363]; and Cooley v. O'Conner [12 Wall. (79 U. S.) 391]. This Case of Carr was one in which the legal title and the equities were on the side of the United States, in which this was decided to be the case, and in which the supreme court goes on to decide that contrary decisions on this title in inferior state courts in suits to which the United States were not a party did not estop the United States from recovering.

The case at bar—the Arlington Case—is the reverse of this. The jury on the facts, and the court on the law of the case, have decided that the plaintiff is entitled to recover the land. The statutory law regulating the practice expressly allowed the right to be tried after service of the declaration in ejectment on the occupant of the land, and in the action of ejectment the government voluntarily intervened. There is no question of estoppel here. The case has gone to a verdict. Nothing remains to be done except to enter judgment so that the case may go before the supreme court on a writ of error, or for execution to issue on the judgment. I should not be willing to order the execution under any circumstances; but I do see nothing in the case of Carr v. U. S. to require me to dismiss this suit at the present time.

[NOTE. This case was taken to the supreme court upon two writs of error, one prosecuted by the United States eo nomine, and the other by the attorney general of the United States in the names of Kaufman and Strong. These two writs are considered together by the court. The main propositions involved therein are: (1) Could any action be maintained against the defendants for the possession of the land in controversy under the circumstances of the relation of that possession to the United States, however clear the legal right to that possession might be in plaintiff? (2) If such an action could be maintained, was the

prima facie title divested by the tax sale and the certificate given by the commissioners? Mr. Justice Miller delivered the opinion of the court, in which he says: "It is believed that no division of opinion exists among the members of this court on the proposition that the ruling of law under which the latter question was submitted by the court to the jury was sound, and that the jury were authorized to find, as they evidently did find, that the tax certificate and the sale which it recited did not divest the plaintiff of his title to the property. No substantial objection is seen on the face of the certificate to its validity, and none has been seriously urged. It was admitted in evidence by the court, and, unless impeached by extrinsic evidence offered by the plaintiff, it defeated his title." Upon the question of the evidence offered by the plaintiff the learned justice remarks: "It is proper to observe that there was evidence, uncontradicted, to show that Mr. Fendall appeared before the commissioners in due time, and offered, on the part of Mrs. Lee, in whom the title then was, to pay the taxes, interest, and costs, and was told that the commissioner could receive the money from no one but the owner of the land in person." The sales of the property under the conditions of this case could not divest the plaintiff's title, for, says the learned justice, continuing: "The commissioners having, in the execution of the law, acted upon a rule which deprived the owner of the land of an important right,—a right which has, in no instance known to us, or cited by counsel, been refused to a taxpayer,—the sale made under such circumstances is invalid; as much so as if the tax had been actually paid or tendered." Upon the first question—the relation of the possessions of the United States—the learned justice examines very fully a number of English and American cases, as also all of the previous cases touching upon the points which have been heard in the supreme court, after which he says: "This examination of the cases in this court establishes clearly the result that the proposition that, when an individual is sued in regard to property which he holds as officer or agent of the United States, his possession cannot be disturbed when that fact is brought to the attention of the court, has been overruled and denied in every case where it has been necessary to decide it; and that in many others, where the record shows that the case as tried below actually and clearly presented that defense, it was neither urged by counsel nor considered by the court here, though, if it had been a good defense, it would have avoided the necessity of a long inquiry into plaintiff's title, and of other perplexing questions, and have quickly disposed of the case. And we see no escape from the conclusion that during all this period the court has held the principle to be unsound." The judgment of the circuit court is affirmed, Mr. Justice Gray, dissenting. 106 U. S. 196, 1 Sup. Ct. 240. For the findings of the circuit court and the judgment entered in a similar case to this, brought by the same plaintiff, see Case No. 8,185.]